**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| CITY OF SAN ANTONIO, TEXAS,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; and DAVID VENTURELLA, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement,<br><br>*Defendants*. | Civil Action No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiff City of San Antonio, Texas ("City") brings this action seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, to halt Defendants' unlawful decision to establish a massive immigration detention facility within the City's limits.

2. On or about February 5, 2026, Defendants United States Department of Homeland Security ("DHS") and the U.S. Immigration and Customs Enforcement ("ICE") confirmed that they had purchased a 640,000 square foot commercial warehouse (the "Warehouse") in San Antonio, Texas with the intention to convert it into an immigration detention facility with as many as 1,500 beds (the "Detention Conversion Project").

3. The Warehouse was designed for the storage and transloading of commercial goods—not for any human residence.

4. Defendants' decision to purchase the Warehouse is part of a nationwide scheme to build a mass-immigration-detention apparatus, and in particular to expand those activities in Texas. Defendants are purchasing warehouses nationwide to retrofit them into immigration detention and processing centers capable of holding tens of thousands of immigrants to facilitate ICE's stated goal of running deportation operations "like [Amazon] Prime, but with human beings." Indeed, in Texas, ICE has purchased at least three other warehouses to turn into immigration detention centers, including a similarly-sized potential processing center in Los Fresnos and two "mega" detention centers in Hutchins and El Paso.

5. The Detention Conversion Project threatens the environmental, economic, public health, and safety interests of the City of San Antonio and its people. For example, Defendants have entirely failed to follow any of the required sewer and water system upgrades needed to ensure detention center operations will not cause discharges of harmful contaminants into public wastewater treatment centers and surface waters. ICE has also been reported to horribly overcrowd its detention centers, fail to adequately care for the health of its detainees, and fail to maintain safe or sanitary conditions. Indeed, in just the past few months, *two* separate ICE facilities in Montana and Texas had measles outbreaks. These alarming conditions could endanger public health and require a response by City health officials.

6. In their rush to convert warehouses into Amazon-like store-and-ship facilities for immigrants, Defendants have trampled over federal law designed to protect the City and other stakeholders' interests. NEPA requires federal agencies to conduct a "hard look" at the environmental consequences of federal actions *before* those actions are taken. And that "hard look"

must culminate in a thorough, comprehensive Environmental Impact Statement where, as here, it is reasonably foreseeable that the environmental impacts of an agency's decision would be significant. Likewise, the APA requires agencies to act in a transparent and reasoned way, including through the consideration of reasonable alternatives. These requirements are critical limits on agency action, and they provide important assurances that environmental considerations are integrated into federal decisions and that cities and other interested parties have the relevant information to participate meaningfully in those decision-making processes themselves.

7. Defendants disregarded these requirements. To the City's knowledge, Defendants conducted *no* NEPA review of the Detention Conversion Project's environmental impacts before purchasing the Warehouse. Nor have they done so to date. Similarly, Defendants have shown no evidence of reasoned decision-making required by the APA. Worse still, despite the major implications of siting a large ICE detention facility within the City's limits, Defendants have provided little-to-no information to the City about its plans for the Warehouse, depriving the City of the key information it needs to fully assess the harm Defendants' actions will have on the City's interests.

8. Defendants' actions cannot withstand scrutiny under the APA or NEPA. This Court should vacate and set aside Defendants' decision to purchase the Warehouse and awarding of a $17 million contract for the purpose of converting it into an immigration detention facility. This Court should also enjoin any further implementation of that decision, including any further activity related to the Detention Conversion Project.

## JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction).

10. Venue is proper in this District under 28 U.S.C. § 1391(e)(1), as the City resides in this District and a substantial part of the acts or omissions giving rise to this action, namely the Warehouse's location, occurred in this District.

## PARTIES

11. Plaintiff City of San Antonio is a city located in Bexar County, Texas.

12. Defendant Markwayne Mullin is the Secretary of Homeland Security and the head of the U.S. Department of Homeland Security. The City sues him in his official capacity.

13. Defendant DHS is a department of the Executive Branch of the United States Government and is a federal agency under the APA, 5 U.S.C. § 551(1).

14. Defendant David Venturella is the Acting Director of ICE. The City sues him in his official capacity.

15. Defendant ICE is a federal agency of the United States Government and is a federal agency under the APA, 5 U.S.C. § 551(1). ICE operates under the supervision of DHS.

## BACKGROUND

### I. Legal Background

#### a. NEPA

16. Congress passed NEPA to "prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Congress declared "that it is the continuing policy of the Federal Government, *in cooperation with State and local governments*, and other concerned public and private organizations, to use all practicable means and measures" to "restor[e] and maintain[] environmental quality to the overall welfare and development of man." 42 U.S.C. § 4331 (emphasis added).

17. NEPA "ensure[s] that federal agencies 'carefully consider detailed information concerning significant environmental impacts' and at the same time 'guarantee that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" *Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2003) (quoting *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1993)). "The point . . . is not merely that an agency produce a report but 'that environmental concerns be integrated into the very process of agency decision-making.'" *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 197-98 (2025) (Sotomayor, J., concurring) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979)).

18. NEPA accomplishes these goals by requiring federal agencies, including ICE, to (1) "collect accurate scientific data and 'disseminate information concerning the projects' environmental consequences,'" and (2) implementing "procedures [that] are in place to ensure the government takes a 'hard look' at the effects of its decisions before approving projects that alter our shared environment." *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of. Transp.*, 98 F.4th 178, 189 (5th Cir. 2024) (citations omitted).

19. NEPA further requires federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i).

20. This report is called an Environmental Impact Statement ("EIS"), and must include: "reasonably foreseeable adverse environmental effects which cannot be avoided"; "a reasonable range of alternatives" including a "no action alternative"; a discussion of "the relationship between

local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and an accounting of the "irreversible and irretrievable commitment of Federal resources" from the proposed action. 42 U.S.C. § 4332(C)(ii)-(v).

21. An EIS must be prepared for any "major Federal action"; "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

22. NEPA defines "major Federal action" broadly: "an[y] action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). DHS's own "Instruction Manual" states that "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS under the direction of Congress." U.S. Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)* at III-1 (Nov. 6, 2014), https://perma.cc/HUH5-FAV3 ("DHS Instruction Manual").

23. That same Instruction Manual requires DHS to consider a broad range of environmental impacts under NEPA, including "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects. *Id.* at II-2.

24. If an agency does not expect a major federal action will have significant impacts on the environment, or if that significance is unknown, an agency "shall prepare an environmental assessment" instead of an EIS. 42 U.S.C. § 4336(b)(2). An environmental assessments ("EA") "shall be a concise public document" that either sets forth the basis for the agency's finding of no significant impact or a determination that an EIS is in fact required. *Id.*

25. DHS's Instruction Manual states that a categorical exclusion is only appropriate where an action "[c]learly fits the category described in the [categorical exclusion]," "[i]s not a piece of a larger action," and "[n]o extraordinary circumstances exist." DHS Instruction Manual at V-4 to V-5. That same Manual says a proposed action must "clearly meet all three conditions" for a categorical exclusion to apply. *Id.* at V-4.

26. These NEPA reviews—including the preparation of an EA, EIS, or invocation of any categorical exclusion—must take place *before* the agency takes the proposed action. 42 U.S.C. § 4332(C). As the Supreme Court put it, "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered *after* resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (emphasis added).

27. NEPA also contains mandatory consultation processes with states, local governments, and other federal agencies. "Prior to making any detailed statement, the head of the lead agency [for a proposed project] *shall* consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(C) (emphasis added). NEPA further requires that "[c]opies of such statement and the comments and views of the appropriate Federal, State, and *local agencies*, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public . . . ." *Id.* (emphasis added).

28. DHS's Instruction Manual proclaims that "[o]pen communication . . . is DHS policy" for NEPA reviews. DHS Instruction Manual at IV-6. DHS recognizes that "collaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in

DHS planning and decision-making," and that DHS must ensure that "[p]ublic involvement starts early and continues throughout the NEPA process." *Id.*

29. To that end, the DHS Instruction Manual specifies that "collaboration and public involvement in NEPA activities include the following three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments." *Id.* at IV-6 to IV-7.

**b. APA**

30. "The APA 'sets forth the procedures by which federal agencies are accountable to the public.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). At its core, the APA "requires agencies to engage in 'reasoned decisionmaking,'" *id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)), which means "articulat[ing] a satisfactory explanation for [agency] action" including "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29-30, 43 (1983) (cleaned up).

31. The APA provides that federal courts "shall" find unlawful and "set aside" agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2). Actions are arbitrary or capricious where an agency "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

32. Moreover, if an agency alters a prior policy, its analysis must consider less disruptive alternatives that are "within the ambit of the existing policy," and are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Wages & White Lion Invs., L.L.C. v. U.S. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021) (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 30 (internal quotations omitted)).

33. When an agency changes its position, it must acknowledge it is doing so, provide a "reasoned explanation" for the change, and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations*, 566 U.S. 502, 515 (2009) (citations omitted).

## II. Factual Background

### a. ICE has historically conducted NEPA analyses before constructing and operating new detention facilities.

34. ICE currently operates detention centers throughout the United States by working with private contractors, states, and local governments. Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term* 7 (Jan. 14, 2026) https://perma.cc/T3PM-GSER.

35. Historically, ICE has avoided expanding or constructing new detention facilities "because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority." U.S. GAO, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://perma.cc/Z2E6-M2GS.

36. When the government *has* expanded or constructed new detention facilities, DHS and ICE have historically conducted pre-action NEPA reviews, even where proposed detention facilities were smaller than the proposed Detention Conversion Project here. Those include, at minimum:

- U.S. Dep't of Homeland Sec., *Environmental Assessment for the Proposed Contract Detention Facility* (Dec. 29, 2016), https://perma.cc/G2VS-N3EM (EA for "construction, renovation, and operation" of a facility with a "minimum operational capacity of 1,000 beds . . . and a maximum of 1,200 beds").
- U.S. Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operating, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97 (EA to "construct, operate, and maintain a new . . . 200,000 square foot" detention facility with capacity for "up to 1,000 undocumented citizens . . . .")
- U.S. Dep't of Homeland Sec., *Final Environmental Assessment for El Paso, Texas Service Processing Center* (Sept. 15, 2021), https://perma.cc/VED3-J4BP (EA for construction work at 166,206 square foot detention center in El Paso with a bed capacity of 840).

**b. ICE abandons NEPA process in favor of swiftly acquiring new detention facilities.**

37. ICE has now abandoned NEPA's safeguards that it once routinely followed, instead favoring a speed-first approach designed to accelerate mass detention and deportations.

38. As early as April 2025, ICE leadership announced its goal of "treating [immigration enforcement] like a business," and to handle deportations "like (Amazon) Prime, but with human beings." Marina Dunbar, *ICE director wants to run deportations like 'Amazon Prime for human beings'*, The Guardian (Apr. 9, 2025), https://perma.cc/GG9G-3VXHhttps.

39. Three months later, Congress appropriated $45 billion for ICE detention centers as part of the One Big Beautiful Bill Act. Pub. L. No. 119-21, § 90003, 139 Stat. 72, 358 (2025). Nothing in this appropriation exempted ICE detention centers from NEPA or any other legal regimes.

40. On February 21, 2026, ICE released a document announcing its "Detention Reengineering Initiative," the cornerstone of which was "acquisition and renovation of eight large-scale detention centers and 16 processing sites, as well as the acquisition of 10 existing 'turnkey' facilities where ICE ERO [Enforcement and Removal Operations] already operates." U.S. Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* 1, (Feb. 21, 2026) https://perma.cc/6P63-LAWW. ICE's initiative calls for an "increase [in] bed capacity to 92,600 beds" with "plans to activate all facilities by November 30, 2026 . . . ." *Id.*

41. That same document claimed that "ICE is complying with the National Environmental Policy Act (NEPA) to evaluate the impacts of proposed actions and their reasonable alternatives," including "to assess the environmental implications of acquiring property to house a processing facility, as well as the feasibility of alternative options." *Id.* at 2. It further claims that "NEPA surveys were also conducted for each site" of a new detention facility. *Id.* at 3.

42. The City is informed and believes, and on that basis alleges, that despite ICE's claims, no NEPA process has taken place whatsoever for Defendants' acquisition of the Warehouse or any other part of the Detention Conversion Project.

43. Similarly, just a few months ago, the U.S. District Court for the District of Maryland issued a temporary restraining order and preliminary injunction enjoining ICE's conversion of a similar warehouse in Maryland after concluding that ICE failed to conduct the requisite NEPA reviews prior to its acquisition. Order Granting TRO, *Maryland v. Noem*, No. 26-733-BAH (D. Md. Mar. 11, 2026), ECF No. 8; Order Granting PI, *Maryland v. Mullin*, No. 26-733-BAH (D. Md. Apr. 15, 2026), ECF No. 42.

44. In response to lawsuits across the country, ICE has agreed to either drop plans to perform similar warehouse conversions or agreed to stop their conversion efforts while ICE

conducts the required NEPA review. *E.g.*, *New Jersey v. ICE*, No. 2:26-cv-02884 (D.N.J.) (ICE agreeing to stay litigation pending further NEPA review and planning); *Michigan vs. DHS*, No. 2:26-cv-10968 (E.D. Mich.) (ICE agreeing to stay case after announcing it intended to abandon conversion plans and instead planned to sell the subject warehouse); *Arizona v. Mullin*, No. 2:26-cv-02857 (D. Ariz.) (ICE stipulating to stay while conducting NEPA review); *City of Social Circle v. ICE*, No. 3:26-cv-00054 (M.D. Ga.) (ICE moving to stay case after announcing they have dropped plans to operate warehouse as a detention center); *Cnty. of Santa Clara v. ICE*, No. 5:26-cv-05604 (N.D. Cal.) (ICE voluntarily pausing construction pending resolution of preliminary injunction motion).

**c. ICE purchases the Warehouse in San Antonio to convert into a mass detention facility.**

45. Defendants have not been transparent with the City in their efforts to develop the Detention Conversion Project. Thus, the City has been forced to piece together factual developments about the Detention Conversion Project from public reporting and limited documentation.

46. As part of their Detention Reengineering Initiative, Defendants set their eyes on San Antonio. On or around February 5, 2026, ICE confirmed that they had purchased the Warehouse located at Oakmont 410, 542 S.E. Loop 410, San Antonio Texas, 78220.

47. The Warehouse totals 639,595 square feet, sitting on a 39-acre lot. The marketing materials for the Warehouse advertise it as "SAN ANTONIO'S LARGEST INDUSTRIAL SPEC DEVELOPMENT." Those same materials further state that the Warehouse only contains enough "restrooms to accommodate 800 warehouse employees."

48. ICE has stated that it plans for the Detention Conversion Project to have an "average daily population" of up to 1,500 detainees plus an undisclosed number of ICE staff. However, on information and belief, media outlets have provided differing reports on the number of detainees that ICE intends to place in the Detention Conversion Project, with estimates ranging from 1,500 to 9,000 detainees. This raises potential overcrowding concerns, similar to those reported at other ICE facilities. Detainees would be forced to live in the facility around-the-clock and indefinitely, even though the Warehouse's utilities were only set up to support warehouse employees during working hours.

49. The City, on information and belief, also alleges that ICE purchased the facility for $66.1 million, despite the property having an assessed value of only $37 million.

50. The Warehouse interiors are largely empty and devoid of improvements. ICE will need to conduct significant renovations to convert the Warehouse into its proposed immigration detention facility.

51. The City's inability to obtain information about Defendants' plans for the Warehouse has not been for lack of trying. Throughout 2026, City officials sent five letters to Defendants pleading for information about Defendants' plans and to initiate the local coordination that NEPA and DHS policy requires. Defendants did not respond to all of those letters and, in their most recent response, Defendants promised that Defendants would coordinate with local officials about their plans for the Detention Conversion Project after award of the contract for the Detention Conversion Project.

52. Defendants did not make good on that promise. Instead, on August 28, 2026, the City learned that ICE awarded the security contractor GardaWorld Federal Services, LLC a $17 million contract to begin outfitting the Warehouse for use as the Detention Conversion Project.

Since then, neither ICE nor GardaWorld have contacted the City or announced any NEPA evaluation for the Detention Conversion Project.

**d. Defendants' purchase and conversion of the Warehouse will harm the City.**

53. Defendants have failed to disclose any meaningful information about the Detention Conversion Project to the City. This lack of coordination and failure to conduct the required NEPA review causes serious harms to the City. At minimum, Defendants should have considered the issues below before they purchased and funded the Detention Conversion Project.

54. ***Sewage and Water Systems.*** The City provides drinking water, waste water collection and treatment, and water conservation services to 1.8 million people in the San Antonio area. San Antonio has the largest direct recycled water system in the nation and maintains 13,000 miles of water and sewer mains.

55. Wastewater is treated at publicly owned treatment works ("POTWs"). Treated wastewater is then discharged into surface waterways throughout the San Antonio area or recycled and redistributed it to consumers. These discharges are regulated under various federal, state, and local laws, including but not limited to the Clean Water Act, the Solid Waste Disposal Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, and the Marine Protection, Research, and Sanctuaries Act. For example, the City's POTWs are subject to Texas's Pollutant Discharge Elimination System ("TPDES") permits, which set forth standards that treated wastewater must meet before they can be discharged into San Antonio's surface waterways.

56. POTWs are designed to treat domestic wastes from households. They are not designed to treat certain wastes from industrial or commercial facilities. Thus, if those wastes are discharged into public sewer lines and reach POTWs, they may be discharged into surface waterways, contaminating the environment. Certain wastes can also cause serious problems if

they are discharged into public sewer lines and reach POTWs by, for example, corroding pipelines or disrupting the biological treatment processes POTWs use to remove organisms and harmful contaminants.

57. To protect against these risks, the City administers (and the Texas Council for Environmental Quality ("TCEQ") mandates) a Pretreatment Program for such wastes. Chapter 34 of San Antonio's City Code lists specific wastes subject to Pretreatment, which include: fats, oils, grease, foods, blood, dental amalgams, petroleum, gasoline, certain detergents and emulsifiers, antibiotics, material containing viruses or other pathogens. S.A., Tex., City Code § 34-472(2). In addition, Chapter 34 states "[n]o user shall introduce or cause to be introduced into the POTW any pollutant or wastewater which causes pass through or interference." *Id.* § 34-472(1). "Pass through" refers to when a pollutant exits a POTW into natural waterways in a manner that causes a violation of a POTW's TPDES permit. *Id.* § 34-471(6). "Interference" refers to when a pollutant disrupts the treatment processes or operation of a POTW or otherwise causes the POTW to violate federal, state, or local laws or permits. *Id.*

58. The Pretreatment Program may require a facility to install onsite treatment systems and technologies to ensure that any contaminants requiring Pretreatment are treated prior to entering public sewer lines.

59. Facilities that will discharge to public sewer lines must submit a Pretreatment permit application at least 180 days prior to any discharge. That application must disclose the facility's intended operations, such that they may be fully analyzed to determine whether Pretreatment is required.

60. Defendants have submitted no such application. Nor have they, to the City's knowledge, attempted to coordinate with any City staff about their water and sewage usage at the

Warehouse beyond a short interaction in February of 2026 when a DHS employee requested a change in the Warehouse's billing account. At that time, the DHS employee stated they needed to increase the Warehouse's projected sewer and water capacity to accommodate 1,000 individuals. City staff informed the DHS employee of the applicable regulations and that DHS would need to enter into a Utility Service Agreement ("USA") to expand existing water and sewer services to the Warehouse. There has been no further outreach from Defendants on this issue.

61. Defendants have not disclosed what contaminants Defendants' operations would cause to be discharged into public sewer lines and POTWs. However, ICE's Operations Manual sets forth certain "Performance-Based National Detention Standards" that require providing on-site medical and dental care at ICE detention centers. U.S. Immigration & Customs Enf't, *Performance Based Detention Standards 2011*, *Rev. 2016* § 4.3.V.A., https://perma.cc/3U3N-RX36 ("ICE 2011 Standards"). These standards include providing to all "detainee population[s]" at "[e]very facility" all "[m]edically necessary and appropriate medical, dental, and mental health care and pharmaceutical services . . . [c]omprehensive, routine, and preventive health care . . . [e]mergency care . . . and [s]pecialty health care . . . ." *Id.*; *see also id.* § 4.3.V.F. (requiring that "[a]dequate space and equipment shall be furnished in all facilities so that all detainees may be provided basic health examinations and treatment . . . ."). They also contemplate "dental treatment . . . to detainees in ICE custody . . . including amalgam and composite restorations . . . ." *Id.* § 4.3.V.R. "Blood products and designated body fluids shall be poured slowly and carefully down a toilet . . . ." *Id.* § 1.2.V.D.6.c.3.

62. ICE detention centers may also store large amounts of gasoline in on-site storage tanks to support their operations. For example, the Port Isabel center in Los Fresnos, Texas holds approximately 1,200 detainees and several above-ground storage tanks with as much as 10,000

gallons of gasoline. U.S. Immigration & Customs Enf't, *Port Isabel Service Processing Center Final Environmental Assessment* at 9, 52 (Feb. 21, 2019) https://perma.cc/528A-GPRG. ICE vehicles "operating onsite may occasionally contribute to minor oil and gasoline leaks." *Id.* at 52.

63. ICE detention centers may also have on-site kitchen operations that generate food waste such as fats, oils, and grease. *See* ICE 2011 Standards § 4.1 (describing requirements for kitchen equipment installation, sanitation, and safety at ICE detention centers). Certain "Controlled Hazardous Substances" like industrial solvents, paint thinners, degreasers, and other cleaning agents are sometimes used at ICE detention centers. *See id.* § 1.2.V.B.12.

64. Defendants have shown their willingness to begin work at proposed ICE detention centers without making much-needed upgrades to vital sewage and septic systems. For example, Defendants' construction of a ICE detention center in California was recently enjoined after plaintiffs alleged Defendants commenced conversion efforts despite making "no attempt . . . to obtain required approvals for a septic system expansion . . . to safely pump, treat, and disperse wastewater generated onsite." ECF No. 1 at 4, Compl., *Cnty. of Santa Clara v. ICE*, No. 5:26-cv-05604 (N.D. Cal. June 10, 2026).

65. Based on Defendants' refusal to coordinate with the City, the City is informed and believes, and on that basis alleges, that Defendants have no intention to submit a wastewater discharge permit application, much less follow applicable Pretreatment Program requirements.

66. If Defendants are permitted to press forward with the Detention Conversion Project without complying with the required Pretreatment Program processes, the City's public sewer lines and POTWs will remain in jeopardy. Contaminants like petroleum, gasoline, emulsifiers and detergents, blood, antibiotics, and medical materials with bodily fluids or other pathogens might be discharged untreated into public sewer systems. Such materials may harm both the public sewer

lines themselves and the treatment processes at the POTWs. Worse, such materials may enter surface water systems directly, harming organisms within those water systems or citizens that use those waterways. Food wastes, like fats, oils, and grease, may clog public sewer lines and pipes at the POTW.

67. Defendants' unauthorized discharges would also place in jeopardy the POTW's continued compliance with federal, state, and local laws—including their TPDES permits.

68. The Warehouse's on-site sewer lines are also unable to support Defendants' proposed operations. News outlets report that the Detention Conversion Project will house as many as 1,500 detainees at any given time, although ICE may decide to place even more detainees in the Warehouse. Currently, the Warehouse is allotted 26 sewer Equivalent Dwelling Units ("EDUs"), under the understanding that the Warehouse would be operated for normal warehouse activities. To accommodate even 1,000 detainees, the City anticipates the Warehouse would need at least 375 sewer EDUs—a nearly *fifteen* fold increase in usage.

69. The City anticipates that Defendants will need to make significant improvements to the on-site sewer lines to accommodate this capacity. The Warehouse's on-site sewer laterals are currently only 6 inches wide. In addition, Defendants will need to install a new, larger domestic water meter to accommodate increased water usage at the Warehouse. The Warehouse currently only has a 2-inch domestic water meter.

70. To conduct this work, Defendants will need to apply for a Counter Permit. In addition, Defendants will need to pay impact fees for these increases in usage. The City estimates that those impact fees would be between $1.5 and $2 million.

71. Defendants' failure to upgrade the Warehouse's on-site sewer lines would result in potential sewage overflows and backups and generally unsanitary conditions. These conditions

threaten reasonably foreseeable significant impacts to the environment and public health in the City.

72. ***Public Health, Safety, and Emergency Services.*** ICE detention centers have been responsible for public health crises in cities across the country. In July 2026, a ICE detention center in Colorado instituted quarantine procedures after a tuberculosis outbreak. Richard Luscombe, *Tuberculosis outbreak at Colorado ICE jail sickens at least 12 detainees*, THE GUARDIAN (July 14, 2026) https://perma.cc/2Y36-L53Z. In February 2026, another ICE detention center in Dallas had a measles outbreak. Krutika Kuppalli, *Measles in an ICE Facility is a Public Health Failure*, STAT NEWS (Feb. 4, 2026) https://perma.cc/KN7G-WAJ7. These dangerous, unsanitary conditions will only be further exacerbated by sewage overflows caused by Defendants' failure to upgrade the Warehouse's on-site sewer lines.

73. In the event of any public health, safety, or other emergency services, City employees and resources will need to be deployed to address the hazards. This includes City ambulance services and public health specialists.

74. ***Floodplain.*** The concerns regarding emergency services and sewage are amplified by the fact that the Warehouse is located directly adjacent to a 100-year floodplain. A 100-year floodplain is defined as an area that will be inundated by a flood event having a one percent chance of being equaled or exceeded in any given year and is considered by the Federal Emergency Management Agency ("FEMA") to be a special flood hazard area. 44 C.F.R § 59.1. The one percent risk of a flood compounds over time, meaning that if a structure is used for 30 years, there is roughly a 26 percent chance (about 1 in 4) that a flood impacts it at some point during its use. *See* FEMA, *How to Read a Flood Insurance Rate Map (FIRM)*, https://perma.cc/S9TA-7BVL.

75. A sewage backup or overflow at the Warehouse coinciding with a flood event would pose significant health and safety concerns for detainees, others at the facility, and neighboring properties. In addition, a flood in a crowded detention center would pose an immediate risk to the health and safety of detainees and ICE staff.

76. In the event of a flood that posed a danger to human life at the Warehouse, City employees and resources would need to be deployed to address the consequences of any flooding.




*Figure 1, FEMA Flood Map Service Center: Search results for Oakmont 410, 542 S.E. Loop 410, San Antonio Texas, 78220,* https://perma.cc/6S26. *"Zone AE" indicates a 100-year flood zone. See FEMA, Flood Zones, Glossary* (Jul. 8, 2020) https://perma.cc/8H82-2TZ8.

77. ***Hazardous Materials.*** As described above, ICE facilities may use certain hazardous materials—including solvents, degreasers, and other harsh cleaning agents. The City will be harmed from any mismanagement of such materials, including if they are spilled or

discharged into public sewer lines or migrate to public property. Such hazardous materials accidents pose a reasonably foreseeable significant impact to the health and safety of City residents and to City sewer infrastructure, threatening substantial expense for repairs.

78. ***Traffic.*** Operating the Detention Conversion Project will also likely have an impact on traffic, including on roads that the City maintains. Defendants fail to provide any detail regarding the expected traffic impacts to know whether City roads can accommodate the significant increase in traffic that would likely be needed to move detainees to and from the Warehouse. Defendants also fail to provide any information as to whether they will need to close certain roads to accommodate emergency operations to and from the facility, or whether there will be any other acute impacts to traffic in the area.

## CLAIMS FOR RELIEF

### CLAIM 1: Violation of the Administrative Procedure Act
### Action that is Contrary to Law (NEPA, 42 U.S.C. § 4321, *et seq.*)

79. The City realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

80. The APA requires courts to "hold unlawful and set aside agency action" found "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

81. Violations of NEPA are actionable through the APA. *E.g.*, *Spiller*, 352 F.3d at 240.

82. Defendants' development of the Detention Conversion Project is a final agency action reviewable under the APA, 5 U.S.C. § 704.

83. On information and belief, Defendants have not taken any action to ensure compliance with NEPA requirements, nor have they consulted with any federal agency with the

requisite expertise to determine the extent of environmental impacts the Detention Conversion Project will have. To the City's knowledge, Defendants have not conducted any NEPA analysis, and at minimum have failed to prepare an EA or EIS for the Project.

84. To the City's knowledge, Defendants have not invoked any categorical exclusion to excuse Defendants from reviewing the Detention Conversion Project under NEPA, nor does any such categorical exclusion exist.

85. Defendants have not collaborated with the City prior to purchasing the Warehouse or at any point in Connection with the Detention Conversion Project.

86. The development of the Detention Conversion Project is a "major Federal action[]" with impacts to the quality of the human environment that must be evaluated under NEPA, 42 U.S.C. § 4332(C).

87. This "major federal action" is under Defendants' substantial direction and control. 42 U.S.C. § 4336e(10)(A).

88. Defendants' failure to conduct the required environmental reviews under NEPA deprives the City, its citizens, and other interested parties of the procedure, transparency, and information to which they are entitled by law. The Detention Conversion Project threatens reasonably foreseeable significant impacts to the environment and public health in the City, including without limitation to the water and sewer systems, traffic, hazardous materials, and emergency services.

89. The Court should vacate and set aside Defendants' decision to purchase the Warehouse for the purpose of converting it into an immigration detention facility and enjoin any further implementation of that decision, including but not limited to any further activity to develop the Detention Conversion Project.

**CLAIM 2: Violation of the Administrative Procedure Act**
**Arbitrary and Capricious (5 U.S.C. § 706(2))**

90. The City realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

91. Courts must "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2).

92. Defendants' decisions to develop the Detention Conversion Project are arbitrary and capricious. Namely, Defendants have failed to offer any explanation for their action, much less a "satisfactory explanation" that includes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Nor have Defendants shown that they considered any reasonable alternatives to their decision.

93. Defendants further failed to provide any explanation—let alone a reasoned explanation—for their change in position that NEPA review is required for projects that involve the purchase, construction, renovation, and operation of immigration detention and processing centers.

94. Defendants further failed to consider important aspects of the problem, including the impact that Defendants' decision will have on public health, safety, the environment, and the City's interests.

95. The Court should vacate and set aside Defendants' decision to purchase the Warehouse for the purpose of converting it into an immigration detention facility and enjoin any further implementation of that decision, including but not limited to any further activity to develop the Detention Conversion Project.

## REQUEST FOR RELIEF

Based on the foregoing, the City respectfully requests that the Court:

i. Declare that the Defendants' decision to purchase, convert, maintain, and operate an immigration detention facility at the Warehouse is contrary to law and violates NEPA and the APA;

ii. Vacate and set aside Defendants' decision to pursue the Detention Conversion Project;

iii. Permanently and temporarily restrain, enjoin, and stay Defendants from further implementation of the Detention Conversion Project;

iv. Award the City its reasonable attorney fees and costs, as authorized by applicable law; and

v. Grant such other relief as this Court may deem proper.

DATED: October 13, 2026

Respectfully submitted,

*<u>/s/ Deborah Lynne Klein</u>*

Deborah Lynne Klein
Deputy City Attorney, Litigation
City Attorney's Office
City of San Antonio
203 S. Saint Mary's Street, 2nd Floor
San Antonio, Texas 78205
210-207-8919
Deborah.Klein@sanantonio.gov

W. Eric Pilsk (*pro hac vice* pending)
Kaplan Kirsch, LLP
1634 I Street, N.W., Suite 300
Washington, D.C. 20006
(202) 355-0246
epilsk@kaplankirsch.com

Paul Caintic (*pro hac vice* pending)
Cassandra Hott (*pro hac vice* pending)
Kaplan Kirsch, LLP
1675 Broadway, Suite 2300

Denver, CO 80202
(720) 797-4551 (Caintic)
(303) 389-4559 (Morris)
pcaintic@kaplankirsch.com
cmorris@kaplankirsch.com

*Attorneys for Plaintiff City of San Antonio*